IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| LINDA A. TAYLOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:05-CV-022 |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claim for disability insurance and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. For the reasons provided herein, defendant's motion for summary judgment [doc. 16] will be granted, and plaintiff's motion for judgment on the pleadings [doc. 14] will be denied. The final decision of the Commissioner will be affirmed.

I.

*Procedural History*

Plaintiff was born in 1960 and has a twelfth grade education. She applied for benefits in May 2002, claiming to be disabled by fibromyalgia. [Tr. 100]. Plaintiff alleges a disability onset date of October 12, 2001. [Tr. 61, 92]. Her applications were denied initially and on reconsideration. Plaintiff then requested a hearing, which took place before

an Administrative Law Judge ("ALJ") on January 7, 2004. [Tr. 282].

On June 12, 2004, the ALJ issued a decision denying benefits. Therein, he found that plaintiff suffers from "status post right partial colectomy surgery . . . ; stage II colon carcinoma . . . ; colectomy surgery . . . ; fibromyalgia; history of Hodgkin's disease in remission since 1988; status post left sided carpal tunnel release . . . ; hypertension; chronic neck and back pain; [and] affective and anxiety related disorders," which are "severe" impairments but not equivalent, singularly or in concert, to any impairment listed by the Commissioner. [Tr. 21]. Despite a limiting Medical Opinion Form completed by a former treating physician, the ALJ concluded that plaintiff retained the residual functional capacity to return to her past relevant work. [Tr. 21-22]. Plaintiff was accordingly found "not disabled."

Plaintiff then sought review from the Commissioner's Appeals Council. Review was denied on November 17, 2004. [Tr. 5]. The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481. Through her timely complaint, plaintiff has properly brought her case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Relevant Background*

Plaintiff's past work includes jobs as a cook, packer, document clerk, dispatcher, and social services assistant. [Tr. 101, 123-27]. She states that her fibromyalgia

2

"makes it almost impossible to do any type of work" due to stiffness, constant pain, numbness, drowsiness, and the inability to sit or stand for more than ten minutes at a time. [Tr. 107, 109]. Plaintiff purportedly "can not do anything that I was able to do 3-4 years ago." [Tr. 109]. However, the record indicates that she remains able to perform light gardening, feed birds, cook, grocery shop, visit Walmart once per week, care for her three dogs, feed fish, skim her small outdoor pond, attend yard sales monthly, and "try to do all the regular household chores." [Tr. 111-13, 115].

A. Physical

The records of Dr. Larry Brakebill reflect an April 2001 visit for "follow up of some multiple medical issues" including "[c]hronic neck and back pain which has been a significant problem." [Tr. 183]. Dr. Brakebill stated that "[m]y suspicion is that she has fibromyalgia[.]" [Tr. 182].[1] Plaintiff's complaints of pain continued in June and August of 2001. On September 5, 2001, plaintiff advised Dr. Brakebill that she was doing fairly well other than sinus/bronchial complaints [Tr. 177], but by that evening she had reported to the

---

[1] Fibromyalgia is a recently recognized condition involving "severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances." *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817 (6th Cir. 1988). "Our task in reviewing this issue is complicated by the very nature of [fibromyalgia]. Unlike most diseases that can be confirmed or diagnosed by objective medical tests, [fibromyalgia] can only be diagnosed by elimination of other medical conditions which may manifest [fibromyalgia]-like symptoms of musculoskeletal pain, stiffness, and fatigue." *Id*. at 819. "[A]lthough some people suffering from fibromyalgia may be totally disabled, most people inflicted with the disease are not disabled. . . . Thus, just because [plaintiff] suffers from fibromyalgia does not mean that she is automatically disabled." *Parven-McGladdery v. Comm're of Soc. Sec.*, No. 02-1052, 2002 WL 31780954, at *1 (6th Cir. Dec. 11, 2002).

3

emergency room due to pain. [Tr. 159].² In December 2001, Dr. Brakebill's office noted "a flare [up] of fibromyalgia," and identified "multiple trigger points at the knees, elbows, hips, etc., consistent with fibromyalgia." [Tr. 175].

Complaints of back and neck pain continued in March 2002. [Tr. 173]. At that time, Dr. Brakebill referenced a "pretty extensive [neurological] workup in the past." [Tr. 173]. Documentation of that neurological study, however, is not a part of the present administrative record.

Dr. Brakebill at least twice advised plaintiff that "narcotics are not the answer" for her chronic pain. [Tr. 175, 181]. He also noted prior use of chronic pain medications which "I have had to monitor [] very closely[.]" [Tr. 173]. Nonetheless, in March 2002, Dr. Brakebill issued a prescription for MS-Contin despite ordering a blood alcohol screening "because of the smell of alcohol on her breath and I am a little bit concerned about that potentially being a problem[.]" [Tr. 172].³ Dr. Brakebill also contemplated "do[ing] urine drug screens as she comes in for followup just to make sure that compliance is not a problem." [Tr. 172].

---

² Plaintiff also visited the emergency room in February 2002 complaining of chronic fibromyalgia pain. [Tr. 164].

³ The ALJ questioned plaintiff on this subject. [Tr. 298-300]. Plaintiff responded that "[t]hat never happened," and could not have happened, because she traveled to the doctor's appointment directly from work (and could not have been drinking at work). [Tr. 299-300]. The court observes, however, that the appointment in question was in March of 2002, and plaintiff elsewhere insists that she stopped working in October of 2001. [Tr. 61, 92, 100-01, 288].

4

Plaintiff's next appointment with Dr. Brakebill was on April 8, 2002. That day, Dr. Brakebill described her as "feeling much, much better. We began her on the MS-Contin and she says that she is just 70-80% better, just doing a whole lot better, feeling better. She still occasionally gets tired, but overall much, much improved." [Tr. 171]. The physician further commented that "[i]n view that she is doing so well, she really does not want to go to the Pain Center and I think that is reasonable at this point in time." [Tr. 171].

Plaintiff next saw Dr. Brakebill four months later, on August 12, 2002. "Aching" in the back and neck continued to be a problem, but Dr. Brakebill recorded that "[t]he biggest issue she is having now is some numbness and tingling in her left hand that bother[s] her off and on, especially when she has to do any physical activity[.]" [Tr. 224].[4] At this visit, Dr. Brakebill completed a Medical Opinion Form supplied by plaintiff's attorney. Therein, the doctor predicted limitations of:

    1. Sitting up to six hours per workday, up to one hour at a time.

    2. Standing/walking up to three hours per workday, up to thirty minutes at a time.

    3. Lifting up to twenty pounds on an infrequent basis.

    4. Fine manipulation, above-shoulder reaching, and standing on a hard surface all limited to no more than very few times per day.

    5. Thirty minutes of rest needed for every two hours of work.

    6. Five to seven medically necessitated absences per month.

---

    [4] Dr. Brakebill ordered a nerve conduction study [Tr. 224], which indicated moderate carpal tunnel syndrome in the left hand. [Tr. 226].

[Tr. 218-20]. Dr. Brakebill further opined that plaintiff's pain is severe, that her complaints are reasonable in light of his observations and diagnoses, and that she meets the American Rheumatological criteria for fibromyalgia. [Tr. 219-20].[5]

Plaintiff then saw Dr. Joseph DeFiore for "10 out of 10" pain in the left hand. Dr. DeFiore diagnosed moderate carpal tunnel syndrome along with some early osteoarthritis. [Tr. 208]. Six days later, Dr. Defiore performed a carpal tunnel release. [Tr. 207]. Two weeks later, plaintiff still reported "some pain" in her left hand, but Dr. DeFiore observed that surgical wounds "are all benign. She has a good range of motion and no evidence of any paresthesias or numbness now in her hand." [Tr. 207].[6]

Dr. Saul Juliao performed a January 31, 2003 Physical Residual Functional Capacity Assessment. He predicted that plaintiff could occasionally lift up to fifty pounds, frequently lift up to twenty-five pounds, and sit and stand/walk approximately six hours each per workday. [Tr. 210]. Handling, fingering, pushing, and pulling would be limited. [Tr.

---

[5] The administrative record indicates that the August 12, 2002 appointment was plaintiff's final, or possibly next-to-final, visit to Dr. Brakebill's office. Further, at the administrative hearing, plaintiff testified that

> I quit seeing him like in 2002, because we did have disagreements. I would go in there and I would tell him, you know, the pain is getting worse and this is not working and that [sic]. And one day he just got an attitude with me and told me that, you know, he didn't believe anything that I said or anything.

[Tr. 300].

[6] Plaintiff testified that the surgery relieved her pain for only six months. [Tr. 294]. Supporting diagnoses beyond that six month period, however, are not present in the medical record. [Tr. 252] (dated April 8, 2003 - noting no "defects, tenderness . . . decreased range of motion, instability, atrophy or abnormal strength or tone in the . . . extremities").

6

210, 212].

Plaintiff was diagnosed with colon cancer in June 2003. She has undergone surgery and chemotherapy. [Tr. 229-50, 262-72]. Her doctors have described her as "doing well" and "recover[ing] well." [Tr. 262, 265, 268, 270-71]. As noted by the ALJ, "no treating oncologist, and there have been several, has submitted any medical source assessment on her inability to physically function[.]" [Tr. 20].

### B. Mental

Plaintiff testified that she has suffered from depression since 1988 and that she cries "a lot." [Tr. 294-95]. Psychologist Michelle Woehr performed a consultative psychological examination on May 24, 2002. Dr. Woehr's conclusions were as follows:

> Mrs. Taylor suffers from moderate depression and has some anxiety problems, but none that interfere seriously with her ability to function mentally. Her memory is intact and she has some problems concentrating, but these seem to be relatively mild. She is taking an antidepressant that works but should be reevaluated to see if it can be modified to give her more benefit, especially at night. . . .
>
> Mrs. Taylor is capable of remembering and carrying out instructions. She would probably get along adequately with co-workers, although a large office or frequent contact with the public might be problematic due to her sensitivity and lack of confidence. Psychologically, Mrs. Taylor is capable of adapting to a work environment.

[Tr. 187].

On June 19, 2002, Dr. Deborah Abraham completed a Mental Residual Functional Capacity Assessment. No limitations were predicted of more than a moderate degree. [Tr. 188-90].

7

III.

*Vocational Expert Testimony*

Vocational expert Jane Colvin-Roberson ("VE") testified at plaintiff's administrative hearing. She identified plaintiff's past jobs as medium and semi-skilled (social services assistant), light and semi-skilled (cook), light and unskilled (packer, document clerk), and sedentary and semi-skilled (dispatcher). [Tr. 303]. If plaintiff's testimony and/or Dr. Brakebill's medical assessment were fully credited, the VE stated that no jobs would be available due to the need for excessive breaks and absences. [Tr. 304-05].

IV.

*Applicable Legal Standards*

This court's review is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g)*; Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). The substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Mullen v. Bowen*, 800 F.2d 535, 545

(6th Cir. 1986) (citation omitted).

A claimant is entitled to disability insurance payments if she (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).[7] Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, she is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

---

[7] A claimant is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. 42 U.S.C. § 1382. "Disability," for SSI purposes, is defined the same as under § 423. 42 U.S.C. § 1382c(a)(3).

9

> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.
>
> 5. Even if claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520 (1997)). Plaintiffs bear the burden of proof during the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *See id.*

V.

*Analysis*

Plaintiff argues that substantial evidence does not support the ALJ's decision to discount either her subjective complaints or Dr. Brakebill's assessment. The court concludes that the ALJ's decision survives substantial evidence review on both issues.

The opinion of a treating source is entitled to controlling weight only if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). A treating physician's opinions may be disregarded "when good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988). If the assessment is not

10

given controlling weight, the ALJ must consider certain factors in determining what weight, if any, the opinion is due: (1) length of treatment relationship and frequency of examination; (2) nature and extent of the treating relationship; (3) supportability; (4) consistency with the record as a whole; (5) specialization of the treating source; and (6) any other factors tending to support or contradict the physician's opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson*, 378 F.3d at 544.

In concluding, at step four of the sequential analysis, that plaintiff's impairments do not prevent her from returning to her past relevant work, the ALJ discussed the relevant § 404.1527(d) factors. For example, as support for the conclusion that plaintiff's impairments had not prevented her "from performing her past relevant work for any continuous, twelve month period of duration" [Tr. 20, 22], the ALJ noted that at the doctor's appointment immediately preceding the completion of the medical assessment "her back and neck pain had resolved to approximately 80% better. The claimant reported that since she was doing so well she did not keep her appointment at the pain clinic and her physician thought that was reasonable[.]" [Tr. 17]. The dramatic gap in Dr. Brakebill's views between the two appointments ("feeling much, much better . . . . just 70-80% better, just doing a whole lot better, feeling better. . . . occasionally gets tired, but overall much, much improved. . . . doing so well" in April 2002 versus unable to meet the attendance requirements of competitive employment in August 2002) is essentially unexplained in the physician's records. *See Hall*, 837 F.2d at 276 (substantial evidence supported rejection of treating

11

physician assessment where the doctor's conclusions were unexplainedly "inconsistent with earlier evaluations").

The only conceivable explanation is that Dr. Brakebill's written assessment was to some degree influenced by plaintiff's new carpal tunnel complaints raised at the August 2002 appointment. The ALJ correctly noted that carpal tunnel syndrome was plaintiff's "biggest issue" in August 2002, and he correctly noted that, according to the objective record, this problem was substantially corrected by surgery. [Tr. 17]. The discrepancy in Dr. Brakebill's views, and the apparently rapid reduction in the severity of plaintiff's carpal tunnel syndrome, is relevant to the consistency and supportability of Dr. Brakebill's assessment. 20 C.F.R. § 404.1527(d)(3)-(4).

The ALJ also cited plaintiff's admitted activity level [Tr. 19] as being inconsistent with Dr. Brakebill's extreme limitations. *See* 20 C.F.R. § 404.1527(d)(4). Further, the ALJ noted the conflicts existing between doctor and patient [Tr. 15], which culminated in plaintiff's termination of the treating relationship because "he just got an attitude with me and told me that, you know, he didn't believe anything that I said or anything." [Tr. 300]. This conflict is an "other factor," 20 C.F.R. § 404.1527(d)(6), which undercuts the value of Dr. Brakebill's assessment by illustrating a lack of trust, familiarity, and communication essential to any meaningful doctor/patient relationship. This conflict also speaks to the supportability of Dr. Brakebill's assessment, 20 C.F.R. § 404.1527(d)(3), and the nature of the treating relationship. 20 C.F.R. § 404.1527(d)(2)(ii).

12

Substantial evidence therefore supports the decision to reject Dr. Brakebill's assessment in favor of the opinion of reviewing physician Juliao (as adjusted downward by the ALJ in consideration of plaintiff's cancer treatment and the credible psychological limitations of record). For these same reasons, substantial evidence also supports the ALJ's decision to not fully credit plaintiff's testimony. "The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

The final decision of the Commissioner will be affirmed. An order consistent with this opinion will be entered.

ENTER:

s/ Leon Jordan
United States District Judge